In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 07-1780, 07-2824

BERNADINE E. MATTHEWS,

*Plaintiff-Appellant,*

*v.*

WISCONSIN ENERGY CORPORATION INCORPORATED,

*Defendant-Appellee.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 05-CV-00537—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED FEBRUARY 21, 2008—DECIDED JULY 7, 2008

———————

Before FLAUM, RIPPLE, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* The issues in this case concern the post-employment relationship between plaintiff-appellant Bernadine Matthews and Wisconsin Energy Corporation Inc. Matthews alleged below that Wisconsin Energy breached a settlement agreement and retaliated against her for filing a discrimination lawsuit by giving several prejudicial job references following her departure from the company. The district court held otherwise, granting Wisconsin Energy's motions for summary judgment as to all of Matthews's claims. We affirm in part and

reverse in part. Because we are reversing in part, we also vacate the district court's award of attorney fees to Wisconsin Energy as the "prevailing party."

## I. Background

Bernadine Matthews began working for Wisconsin Energy, then known as Wisconsin Gas Company,[1] in 1980. Matthews soon became a "commercial service representative," a customer-service position that required in-person dealings with Wisconsin Energy's customers. After an unfortunate workplace injury in 1996—a disgruntled customer attacked her—Matthews took a leave of absence. A number of things then happened while Matthews was on leave that put her at odds with Wisconsin Energy. The first was that she was a member of a class action alleging that Wisconsin Energy had redlined the customers in the Wisconsin metro area, where she lived. Then she disputed a claimed shortage in her pension fund. And lastly, in 1998, Matthews filed a discrimination claim against Wisconsin Energy, a dispute the parties eventually settled.Matthews never ended up returning to Wisconsin Energy, and in April 1999, she and the company executed their first Separation Agreement. Matthews didn't immediately seek another job, instead earning a four-year degree from the University of Wisconsin-Milwaukee. Shortly before earning her degree in 2003, Matthews plotted her return to the market, applying to local compa-

---

[1] Wisconsin Gas officially became Wisconsin Energy Corporation, Incorporated in 2000. For ease of reference, however, we refer to Matthews' employer as Wisconsin Energy throughout.

nies that in turn sought employment references from
Wisconsin Energy.

That's when the troubles, and this case, began. As part
of the 1999 Separation Agreement, Wisconsin Energy
agreed to provide employment references for Matthews as
the need arose. Dissatisfied with the responses that Wis-
consin Energy was providing—she says Wisconsin Energy
denied she had ever worked there—Matthews filed suit
in 2003. In her complaint, she alleged both violations of
the 1999 separation agreement and intentional interference
with prospective contractual relations. The parties soon
settled the dispute, and a new settlement agreement
was forthcoming in December 2003. The Agreement
required Wisconsin Energy to provide an employment
reference for Matthews and also contained an attorney-fees
provision in the event of a future lawsuit. In relevant part,
these sections provided

> Wisconsin [Energy] agrees to respond to any request
> for a reference regarding Matthews in a manner that
> is consistent with the Wisconsin [Energy] policy in
> place regarding reference checks at the time. Wisconsin
> [Energy] will not respond to any request for a refer-
> ence regarding Matthews by indicating that Matthews
> was terminated or fired. . . .

> * * *

> [I]n the event that one of the Parties hereto commences
> a lawsuit or other legal proceeding alleging that the
> other Party breached the Agreement, the prevailing
> Party in that action shall be entitled to recover her or its
> reasonable attorneys fees and expenses incurred in

such lawsuit or legal proceeding from the non-prevail-
ing Party.

An integration clause stated that the written document
"set[ ] forth the entire agreement" and "fully and com-
pletely superseded" any representations made elsewhere.

Before the parties inked this agreement, Wisconsin
Energy's in-house attorney, Lynne English, recited the
terms into the record in open court. In so doing, she
characterized the company's "policy" to be "what you
call name, rank, and serial number." That is, the company
would "confirm people worked there, the dates of em-
ployment, and their position or at least their last position."
Here on appeal, the company describes a similar refer-
ence policy. The company only confirms dates of employ-
ment, final salary, and the last position that the employee
held. Reliance on this objective data prevents the dis-
closure of "subjective information" regarding the former
employee. Although the reference itself is fairly basic,
getting to the relevant information may require an in-
volved search. Former employees come in a number of
categories, and Wisconsin Energy stores information for
these kinds of former employee in a number of different
databases. The information for those who, like Matthews,
left before the 2000 merger of Wisconsin Energy and
Wisconsin Gas has its own database. And searching
this database comes last in the process for providing
references.

Wisconsin Energy claims that this last fact caused
some problems when companies came calling to get a
reference for Matthews, several of which followed from
late 2004 to the end of 2005. Financial Management Services

conducted one such check in October 2004.[2] This check initially resulted in Wisconsin Energy saying that Matthews had never worked there, although the company eventually confirmed she had. Wisconsin Energy blamed the initial error on the tortuous process of searching through several databases to confirm employment information. In addition, following the request, Wisconsin Energy said that Matthews had worked as a "credit specialist" and not as a "commercial service representative." As part of a reorganization during Matthews's leave of absence, the company had, unbeknownst to her, changed her old position to this new name. So, when queried, the database provided this job title as the last position held. FMS then relayed this information to Matthews.

Also in May 2005, Matthews enrolled in a program through the Social Security Administration called the "Ticket to Work Program." This program allows those individuals receiving social-security benefits to work while continuing to receive their benefits. *See generally* The Ticket Program: What is the Ticket Program?, http://www.yourtickettowork.com/program_info (last visited June 19, 2008). To find available jobs, Matthews hired Howard Schwartz, a consultant who specializes in helping disabled individuals seek employment through

---

[2] It's unclear exactly why Matthews hired FMS; that is, whether the company was verifying her employment for Matthews's own edification (i.e., to test the waters) or whether she had hired the firm to find her a new job. Because it is not necessary to resolve this factual issue to decide the case, we assume that FMS called in order to place Matthews in a job, as she alleges. We make no finding as to whether this was actually true.

the program. After performing a review of his client's capabilities, he would then put them into contact with prospective employers. As part of his assessment, Schwartz mailed a letter to the Wisconsin Energy's Vice President of human resources on October 15, 2005. The letter explained Schwartz's role and the program and asked Wisconsin Energy to "confirm [Matthews's] work history . . . and provide comments regarding work performance." No response was forthcoming and a follow-up phone call to Wisconsin Energy's human-resources department went nowhere.

But Wisconsin Energy had received the letter. Given that the VP of human resources did not typically handle reference requests, Schwartz's letter eventually landed on the desk of Lynne English, the in-house attorney who had handled the 2003 settlement agreement with Matthews. On October 19, 2005, English called Schwartz on the phone to discuss the reference. English and Schwartz provided slightly conflicting versions of the phone call during their respective depositions. Schwartz described an "uncomfortable" phone call in which English asked, with an "obvious sense of distrust," why he had sent the letter to the VP of human resources. She then characterized his requested reference as a "sensitive issue to discuss," informing him that Matthews "had been involved in at least one, if not more legal actions against the company." English then asked questions regarding Matthews's social-security benefits, which Schwartz interpreted as being a question whether Matthews "was really entitled to them or [whether she was] cheating the system." English then told him that she would only provide a basic verification of employment, and she would only provide that if she had a written release from Matthews.

English's version differs somewhat. She agreed that she wanted to know why someone would send a reference request to the VP of human resources. And she also agreed that she asked about the social-security program Matthews had enrolled in, although she characterized her request as being motivated more by curiosity than suspicion. English told Schwartz that she was committed to Matthews getting a job after which, she says, Schwartz began pressing his request for a reference. When English said that she could not respond to the letter over the phone, Schwartz asked why—at which point Matthews told him "we are in litigation with Ms. Matthews regarding how we respond to reference requests." English testified that it was "possible" that she said that Matthews had sued twice, but she said the exchange was more lighthearted. In the end, English told Schwartz that he would need to send in an authorization from Matthews for the reference, after which Wisconsin Energy would send the basic reference discussed above. Both sides agree that a few days later Schwartz received a confirmation that Matthews had worked at Wisconsin Energy and that she had worked as a "commercial service representative" before her reclassification as a "credit specialist."

Matthews claims that the poor treatment continued when Wisconsin Energy gave her a negative reference in October 2005. She had applied for a management position at Midwest Airlines. When she received the call telling her that she had not been selected, Matthews claims that one of the stated reasons was a poor reference from Wisconsin Energy. And she suspects that similar poor references scuttled several later applications for other jobs in the Washington D.C. area as well.

In the district court, Matthews filed her original complaint in medias res. After receiving a right-to-sue letter

from the EEOC, she brought suit in the Eastern District of Wisconsin on May 13, 2005—around the same time she first enrolled in the "Ticket to Work" Program and before Schwartz's conversation with English. On August 22, 2006, Matthews filed her motion for summary judgment, and on November 13, 2006, Wisconsin Energy responded with its own. In her motion, Matthews claimed that Wisconsin Energy had violated their 2003 settlement agreement, retaliated against her for filing suit against the company during her leave of absence, and had defamed her. On May 9, 2007, the district court granted Wisconsin Energy's motion on all counts, finding that the evidence gathered during discovery did not create a genuine issue of material fact as to any of Matthews's claims. Wisconsin Energy then sought attorney fees, which the 2003 settlement agreement provided would go to the "prevailing party." The court awarded Wisconsin Energy $173,232.44 in attorney fees, and this appeal followed, consolidating Matthews's appeals of both the summary judgment decision and the fee award.

## II. Discussion

On appeal, Matthews argues that the district court erred in dismissing both her claim that Wisconsin Energy breached the 2003 settlement agreement and her claim that it retaliated against her for her previous lawsuits. We review the district court's decision de novo. *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005). In so doing, we construe all reasonable inferences in favor of the party who lost below. *Id.* The following sections apply this standard to each of Matthews's claims in turn.

### A.  Breach of 2003 Settlement Agreement

Matthews first argues that Wisconsin Energy violated the terms of their 2003 settlement agreement based on the content of its statements to parties seeking references. The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach. *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296 (Wis. 1971). The parties both acknowledge that the settlement agreement is a valid contract, but they dispute the import of the section covering post-employment references. That section provides

> Wisconsin [Energy] agrees to respond to any request for a reference regarding Matthews in a manner that is consistent with the Wisconsin [Energy] policy in place regarding reference checks at the time. Wisconsin [Energy] will not respond to any request for a reference regarding Matthews by indicating that Matthews was terminated or fired. . . . .

Specifically, three terms are in play: (1) whether the contractual term "policy . . . regarding reference checks" is unambiguous so as to preclude the introduction of parol evidence; (2) whether the term "reference" can encompass employment information given to parties that are not themselves employers; and (3) whether the contract plainly allows Wisconsin Energy to give more information than that provided for in its "policy . . . regarding reference checks." The relevant inquiry for each is whether there is ambiguity in the contract. *Clark Oil & Refining Corp. v. Leistkow*, 69 Wis.2d 226, 237-38 (Wis. 1975). If so, it is the jury's job to interpret the intent of the parties, meaning summary judgment was inappropriate here. As it relates to substance, resolving these issues depends on Wiscon-

sin law, *see Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), which the parties incorporated into the settlement agreement.

### 1. Parol Evidence as to Wisconsin Energy's Policy

First, the parties dispute whether or not parol evidence can come in to explain "Wisconsin [Energy's] policy in place regarding reference checks at the time." Matthews says that certain statements made in the course of settling the 2003 case should prove the substance of these policies. So read, Matthews argues, Wisconsin Energy violated the terms of the agreement based on English's conversation with Schwartz as well as through the substance of its responses to FMS and Midwest Airlines. In opposition, Wisconsin Energy argues that the terms of the agreement and the integration clause are plain, thus precluding reliance on parol evidence.

We agree with Wisconsin Energy that parol evidence cannot come in to prove the terms of Wisconsin Energy's "policy . . . regarding reference checks." Before courts go beyond the written terms of the contract, Wisconsin law requires there to be some ambiguity. *Clark Oil & Refining Corp.*, 69 Wis.2d at 237-38. And ambiguity arises when a term "is fairly susceptible of more than one construction." *Mgmt Computer Svces, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 177 (Wis. 1996). Here, there is no ambiguity with respect to Wisconsin Energy's policy covering reference checks. The relevant portion provides

> Wisconsin [Energy] agrees to respond to any request for a reference regarding Matthews in a manner that is consistent with the Wisconsin [Energy] policy in place regarding reference checks at the time.

With respect to the reference obligations, the parties' intentions are clear: Wisconsin Energy must provide Matthews a reference that comports with its "policy in place regarding reference checks at the time"—whatever that may be. This provision clearly and expressly incorporates Wisconsin Energy's reference policies. *Schilling by Foy v. Employers Mut. Cas. Co.*, 212 Wis.2d 878, 888-89 (Wis. App. 1997). And terms incorporated by reference within the contract (but which the contract does not go on to define) do not create an ambiguity. Instead, as long as the extrinsic terms are clearly identifiable, the parties agree to abide by those terms just as they agree to the other terms in the contract. *Mack v. Joint School Dist., No. 3 et al.*, 92 Wis.2d 476, 492 (Wis. 1979); *Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis.2d 444, 452 (Wis. 1979). Thus, evidence of these extrinsic terms is certainly admissible because the parties expressly agreed to them. But the contract's incorporation of Wisconsin Energy's reference policy does not create an ambiguity that allows parol evidence—like English's statements in open court—to come in. *See generally* 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 2008).

In the end, this dispute is of no real moment; Wisconsin Energy's description of its reference policy on appeal parrots that offered by English in 2003. That policy, in place from at least December 2003, provides first that a human resources service desk representative handles the initial reference request. If the request is merely confirming employment information, no release is needed. But if the request asks for more involved information, the request must include a release. At this point, the representative accesses the employment databases and responds to the request. The substance of this re-

sponse would only include the dates of employment, final salary, and the title of the last position held. This last part constitutes the sweep of English's statement before the court that Matthews seeks to admit as parol evidence.

### 2. "Reference" Requests

In addition, Wisconsin Energy argues that neither Schwartz nor FMS could have been seeking a "reference" because neither were prospective employers. But this proposed definition of a "reference" is too narrow. Contractual terms are assumed to have their common meanings, and, for courts to determine these meanings, "it is appropriate to look to definitions in a recognized dictionary." *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 745 (Wis. 1990). As defined by this common meaning, a "reference" does not occur only when the recipient is a potential employer. Even the definition offered by Wisconsin Energy does not impose such a limitation. Its dictionary characterizes a "reference" as "a statement of the qualifications of a person seeking employment or appointment given by someone familiar with the person." MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2008) (online at www.m-w.com). Although the definition identifies the giver—"by someone familiar with the person," like Wisconsin Energy—there is no indirect object limiting a "reference" based on who receives the "statement of the qualifications." Other dictionaries similarly omit a specific indirect object. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1907 (1981) ("a written statement of the qualifications of a person seeking employment or appointment given by someone familiar with his character, ability, experience, or training"); XIII THE OXFORD ENGLISH DICTIONARY 465 (2d ed. 1989) ("The act

of referring one person to another for information or an explanation; hence, a person to whom one is . . . referred for this purpose" and "a report produced by" such a person.). These definitions show that the common meaning of a "reference" does not demand that the recipient be a potential employer. And, as explained above, we assume that the parties meant to give the term its common meaning when contracting. Thus, even though neither FMS nor Schwartz was seeking to employ Matthews, Wisconsin Energy could still have failed to properly "respond to any request for a reference."[3]

### 3. Wisconsin Energy's Obligations

Finally, Wisconsin Energy argues that the agreement only set out its minimum obligations when giving a reference and, with one exception, does not limit what it can tell those who call for a reference. To reiterate, the two relevant

---

[3] This does not mean that the recipient's identity is completely irrelevant. The party who received the request still matters when assessing Matthews's damages. Imagine, for example, that Matthews hired a third party simply to obtain a reference from Wisconsin Energy—but not to otherwise place her in a job. If Wisconsin Energy had breached the agreement when giving a reference to this party, Matthews's damages from the breach would be zero. The collusive nature of the relationship would mean that the breach did not affect her at all, and this would doom her breach of contract claim. *Cf. Szymanski v. County of Cook*, 468 F.3d 1027, 1030 (7th Cir. 2006) (in retaliation case, because reference-checker "did not forward this information to prospective future employers," the reference "would have had no effect on her employment prospects").

sentences setting out Wisconsin Energy's end of the bargain state:

> Wisconsin [Energy] agrees to respond to any request for a reference regarding Matthews in a manner that is consistent with the Wisconsin [Energy] policy in place regarding reference checks at the time. Wisconsin [Energy] will not respond to any request for a reference regarding Matthews by indicating that Matthews was terminated or fired. . . . .

Under Wisconsin Energy's reading, the first sentence sets out the minimum information that must be contained in its response to a reference request, and the second sentence sets out the only kind of information that it cannot disclose. Thus, the disclosure of information beyond that required by its "policy in place . . . at the time" does not constitute a breach—so long as Wisconsin Energy does not "indicate[ ] that Matthews was terminated or fired." To hold otherwise, Wisconsin Energy contends, would be to impermissibly read a non-disparagement provision into the contract. The district court implicitly agreed with this characterization, stating that Wisconsin Energy ultimately complied with its policies when responding to a reference check.

This reading is not implausible. Wisconsin courts have long recognized that the specific mention of an obligation tends to exclude related others not mentioned. *Larson v. Watzke*, 218 Wis. 59, 59 (Wis. 1935) (citing maxim expressio unius est exclusio alterius in interpreting contractual term). But such a construction is not inevitable. The first sentence does not affirmatively indicate that Wisconsin Energy can give any additional information it wants beyond what's called for by its "policy." Wisconsin Energy agreed to respond "in a manner that is consistent

with [its] policy in place regarding reference checks at the time." "Consistent" means "coexisting and showing no noteworthy opposing, conflicting, inharmonious, or contradictory qualities." WEBSTER'S THIRD NEW INTER-NATIONAL DICTIONARY 484 (1981). It's possible that Wisconsin Energy could provide information that is both beyond that required by its "policy" and "inharmonious" with the provisions set out there. Further, the second sentence could just as easily be an explicit exception to Wisconsin Energy's "policy in place regarding reference checks at the time." That is, if the "policy" called for an explanation of whether the employee was "terminated or fired," this second sentence would modify the disclosures as they pertained to Matthews. This provision is thus "fairly susceptible of more than one construction," *Mgmt. Computer Svces, Inc.*, 206 Wis.2d at 177, and this creates an ambiguity. "When a contract provision is ambiguous, and therefore must be construed by the use of extrinsic evidence, the question is one of contract interpretation for the jury." *Id.* Thus, it is for the jury to decide both what the intent of the parties was with respect to this section and, as discussed in the next section, whether Wisconsin Energy breached the contract.

### 4.  Wisconsin Energy's Compliance with the Settlement Agreement

So if Schwartz, FMS, and Midwest could have received "references" and if providing more information than called for under the policy could have been a breach, is there enough evidence to get to a jury? As to FMS, the answer is clearly no. Matthews submits that Wisconsin Energy breached the settlement agreement because it denied that she had ever worked there when FMS called.

It is true that Wisconsin Energy initially failed to verify Matthews's employment. But it quickly resolved its mistake and gave a reference that complied with its policy at the time. Even if the delay fell short of Wisconsin Energy's obligations, Matthews has not shown that this delay damaged her in any way, a prerequisite to stating a claim for a breach of contract. *See Brew City Redevelopment Group, LLC v. The Ferchill Group*, 289 Wis.2d 795, 807 (Wis. Ct. App. 2006). In addition, Matthews claims Wisconsin Energy breached the agreement by listing her final position as a "credit specialist" rather than a "commercial service representative." But this was actually Matthews's last position when she left Wisconsin Energy's employ, even if she never considered herself a "credit specialist." Because Wisconsin Energy's policy at the time called for this information, this wasn't a breach of the settlement agreement either.

Similarly, there is no issue of material fact as to whether Wisconsin Energy breached the settlement agreement when corresponding with Midwest. The district court held that there was no admissible evidence that Midwest had even sought a reference, and we agree. Matthews provided the only relevant testimony. She claimed in her deposition that she had a conversation with a Midwest human-resources representative, Tricell Brown, who said she had received a poor reference. But in her deposition, Brown denied she ever talked with anyone at Wisconsin Energy. Thus, the only evidence that Brown received this reference is Matthews's statement as to what Brown told her. Offering a statement by a third party like Brown to prove a fact contained in that statement is inadmissible hearsay. FED. R. EVID. 801(c); 802. As a result, no admissible evidence supports a claim that Brown

received a poor reference or that Wisconsin Energy otherwise breached the settlement agreement when talking to her.

But the same cannot be said of the reference given to Schwartz. As represented by Wisconsin Energy, its policy entailed verifying only the dates of employment, final salary, and the title of the last position held. Neither participant in the conversation denies that English told Schwartz of Matthews's litigation history. This information went well beyond the objective information concerning Matthews's dates of employment, final salary, and final position held. A jury could believe Schwartz's version of the conversation, which included what would be unfavorable information regarding Matthews. And it could likewise conclude that the parties agreed that Wisconsin Energy would provide only the objective information set out in its "policy." If so, this would show that Wisconsin Energy breached the settlement agreement.

Matthews has also put forth evidence of damages stemming from this breach that a jury could believe. In Wisconsin, a party is damaged if she is denied the benefit of the bargain, and "the award of damages for a breach of contract should compensate an injured party for losses that necessarily flow from the breach." *Thorp Sales Corp. v. Gyuro Grading Co., Inc.*, 111 Wis.2d 431, 438 (Wis. 1983). Here, Matthews's expected benefit from the settlement agreement was to be a more competitive candidate when seeking future employment based on a good reference from her long-time employer. Schwartz testified in his deposition that he took Wisconsin Energy off of Matthews's resume after his conversation with English. Given Matthews's nearly two-decade employ-

ment there, this gap in her employment history could have hurt her prospects of landing a future job through the social-security program. If Schwartz's version is believed, a jury could conclude that Matthews was denied the benefit of this contract when Schwartz so edited her resume, which in turn followed from the conversation between Schwartz and English. This is not to say that a jury must believe Schwartz's version of things. But if the jury does, it could find for Matthews. Accordingly, granting Wisconsin Energy's summary judgment motion on this claim was error.

### B. Retaliation

Matthews also appeals the district court's rejection of her retaliation claim. Below and here on appeal, she claims that the substance of Wisconsin Energy's responses to reference requests was meant as retaliation for her prior EEOC complaints and discrimination lawsuit. The district court granted Wisconsin Energy's motion for summary judgment, reasoning that Matthews had failed to show retaliation. We agree.

Title VII prohibits an employer from retaliating against its employees for "oppos[ing]" discrimination, 42 U.S.C. § 2000e-3(a), and this ban extends to acts of retaliation against former employees, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). The logic is that an employee would be less likely to engage in statutorily protected activity—like suing for discrimination—if the employer could exact some sort of revenge outside of the workplace or when the employee changed jobs. *Id.* at 346; *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 63-64 (2006). Title VII eliminates these disincentives by

giving former employees a cause of action when they've suffered a retaliatory adverse employment action. A plaintiff can prove retaliation directly by showing that her (1) statutorily protected activity (2) caused (3) an "adverse employment action." *Metzger v. Illinois State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Or a plaintiff can prove retaliation indirectly by first showing that (1) she engaged in statutorily protected activity and (2) suffered an adverse employment action (3) even though she performed her job satisfactorily (4) when others who were similarly situated did not receive the same treatment. *Id.*; *Stone v. City of Indianapolis*, 281 F.3d 748, 754-55 (7th Cir. 2003). After this preliminary showing, the burden of production shifts to the defendant to articulate a legitimate rationale for its "adverse employment action," after which the plaintiff must prove that this reason is pretextual. *Id.*

An "adverse employment action" is an employment action that is likely to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. In the context of negative employment references, we have defined this to mean "the dissemination of false reference information that a prospective employer would view as material to its hiring decision." *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006). In *Szymanski*, the plaintiff alleged that her former employer, Cook County Hospital, black-balled her following her termination. Szymanski had successfully challenged her termination as retaliation for a previous discrimination lawsuit, although the court did not order reinstatement. In the course of applying for new jobs elsewhere, she came to suspect that the hospital was giving her negative references and once again filed

suit against the hospital. The district court granted summary judgment for the hospital, and she appealed. After defining an "adverse employment action" as being the "dissemination of false reference information," we affirmed. We reasoned that Szymanski had failed to prove that the hospital ever gave her a negative reference. The vast majority of the information concerning Szymanski's employment was objectively truthful. And those statements that bordered on the subjective were not negative to the point that they constituted an "adverse" action. *Id.* at 1030-32.

Here, a number of Matthews's purported acts of retaliation similarly fail because they were not "adverse." With respect to the statements made to FMS, Wisconsin Energy did not provide any false information.  Her last position was a "credit specialist." And even if the company initially denied the fact of Matthews's employment, it corrected its mistake, meaning that FMS would not have left with any false impression regarding Matthews's previous employment. As for Midwest, for the reasons stated above, there is no admissible evidence that Midwest ever talked with Wisconsin Energy regarding Matthews's employment. So this theory falls short as well.

Matthews also fails to prove that the substance of English's conversation with Schwartz was retaliatory. In the first place, her prior litigation history was objectively true, so English's disclosure of this fact was not adverse. In addition, she has not shown that English's questions regarding her social-security benefits constituted a negative employment reference. Schwartz left the conversation with the impression that English thought Matthews was gaming the system. But English never explicitly

made this claim. Her questions regarding social security arose based on Schwartz's job, which is to place workers receiving social security with employers. Nor did English ever link this "suspicion"—such as it was—to Matthews's previous performance at Wisconsin Energy or to other incidents of her employment. Notably, after the conversation between English and Schwartz, Wisconsin Energy sent along a reference that complied with its policies and that was objectively neutral.

Schwartz's impression after responding to English's questions about his relationship to Matthews is too undefined to have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. And in context, English's questions followed naturally from the details surrounding Schwartz's request. If there was a basis for Schwartz's impression, Matthews's conveying such a suspicion may have been uncalled for. But such an interpersonal slight does not constitute an adverse employment action in the context of this conversation. *Id.* Because showing an "adverse employment action" is a necessary condition under either the direct or indirect methods and Matthews has failed to show one, her claims here must fail.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to Matthews's retaliation claim and her breach-of-contract claims predicated on employment references given to Midwest Airlines and FMS. We REVERSE the district court's grant of summary judgment for Matthews's breach-of-contract claim based

on English's conversation with Schwartz, REMAND for further proceedings consistent with this opinion, and VACATE the district court's award of attorney fees to Wisconsin Energy.