In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 15-1973

STATE OF WISCONSIN LOCAL GOVERNMENT
PROPERTY INSURANCE FUND,

*Plaintiff-Appellee,*

*v.*

LEXINGTON INSURANCE COMPANY,

*Defendant-Appellant,*

*v.*

CINCINNATI INSURANCE COMPANY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-CV-00142-JPS — **J. P. Stadtmueller,** *Judge.*

———————————

ARGUED FEBRUARY 19, 2016 — DECIDED OCTOBER 21, 2016

———————————

Before MANION and ROVNER, *Circuit Judges,* and BLAKEY, *District Judge*.[*]

BLAKEY, *District Judge*. This dispute arises from the 2013 fire at the Milwaukee County Courthouse (the "Court-house"). Milwaukee County (the "County") maintained its primary insurance policy covering the Courthouse with the State of Wisconsin Local Government Property Insurance Fund (the "Fund"). The Fund in turn engaged defendant Lexington Insurance Company ("Lexington") as either its reinsurer or excess insurer (the parties disagree). The County also maintained a separate insurance policy with The Cincinnati Insurance Company ("Cincinnati") that covered machinery and equipment at the Courthouse.

Shortly after the fire, the County filed a claim with the Fund. The Fund paid all but a small portion of the County's claimed losses. The Fund insisted that the remaining unpaid portion of the County's claim should be paid by Cincinnati. Pursuant to separate Joint Loss Agreements in the County's policies with the Fund and Cincinnati, the Fund and Cincinnati agreed to arbitrate their dispute.

This appeal concerns Lexington's attempt to insert itself in that arbitration between the Fund and Cincinnati. The district court denied Lexington's motion to compel arbitration after concluding that Lexington's participation was not contemplated by the plain language of the Joint Loss Agreements. Lexington appealed. For the reasons explained below, we AFFIRM.

---

[*] Of the Northern District of Illinois, sitting by designation.

## I.      Background & Procedural History

At the time of the fire in July 2013, the County held two separate insurance policies covering the Courthouse. The primary policy (the "Fund Policy") was issued by the Fund, and explicitly excluded from coverage certain forms of electrical damage. The County held an additional policy with Cincinnati (the "Cincinnati Policy") that specifically covered electrical and mechanical failure.

Both the Fund Policy and the Cincinnati Policy contain a Joint Loss Agreement ("JLA"). Even though the two JLAs differ in several material respects, both provide that, if the insurers dispute which of them bears the cost of certain damage, the County may compel each to pay one-half of the disputed amount. The insurers then would submit their dispute regarding the paid claim to arbitration. The purpose of the JLAs is to make the County whole quickly, while allowing the insurers to resolve their own dispute separately.

After the fire, the County initially filed a claim for approximately $19 million with the Fund pursuant to the Fund Policy. The Fund paid the County approximately $17.4 million, but disputed the remaining $1.6 million under the theory that the remainder should be paid by Cincinnati. In response, the County invoked its rights under the JLAs with Cincinnati and the Fund. Consequently, the Fund and Cincinnati, consistent with their JLA obligations, each paid one-half of the disputed amount ($800,000) to the County and agreed to arbitrate their dispute.

Meanwhile, the Fund and Lexington maintained a separate policy that provided coverage for the Fund in the event it paid on a claim worth $1.8 million or more (the "Lexington

Policy"). After the Fund made its initial payment to the County, the Fund filed a claim with Lexington under the Lexington Policy, seeking reimbursement for amounts paid by the Fund to the County. Lexington paid the Fund $5 million but disputes that it owes anything more.

In an attempt to secure a declaration regarding the rights and obligations of the respective parties, the Fund initiated this case in the Circuit Court of Milwaukee County. Lexington removed the case to the United States District Court for the Eastern District of Wisconsin and filed a motion to compel Cincinnati and the Fund to allow Lexington to participate in the arbitration contemplated by the JLAs.

The district court identified "two overarching issues" implicated by Lexington's motion to compel arbitration. The first is whether the Lexington Policy incorporated the JLA from the Fund Policy. The district court answered this question in the affirmative, pursuant to the "follow form" provision in the Lexington Policy. The second issue is whether the Fund Policy JLA, as incorporated into the Lexington Policy, compelled Lexington's participation in the arbitration. The district court rejected this proposed participation because: (1) Lexington's participation was inconsistent with the specific text of the Fund Policy JLA; and (2) Lexington failed to meet the Fund Policy JLA's contractual prerequisites to arbitration. We reexamine both issues on appeal.

## II.    Analysis

We review the district court's denial of Lexington's motion *de novo*. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) ("Our review of the issues on this appeal—the question whether an agreement to arbitrate arose,

and the denial of TransUnion's motion to compel arbitration—is *de novo*.").

In doing so, we apply Wisconsin law. The district court presumed that Wisconsin law controls. Given that the Fund and the County are Wisconsin entities, the Courthouse is located in Wisconsin, and the Cincinnati Policy contains Wisconsin-specific endorsements, we agree. Indeed, no party challenged the application of Wisconsin law.

### A.     Courts Decide Gateway Questions

The parties dispute the existence of an arbitration agreement between Lexington and any other entity. Under governing precedent, this is a question reserved for the judiciary. *See Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005) ("Whether the parties have agreed to arbitrate is a question normally answered by the court rather than by an arbitrator. The issue is governed by state law principles governing contract formation."). As such, we reject Lexington's suggestion that the question posed by this appeal should be resolved by an arbitrator. Courts, not arbitrators, are charged with deciding "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452 (2003); *see also Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 589, 591 (7th Cir. 2001) (reaffirming "the principle that courts, rather than arbitrators, usually determine whether the parties have agreed to arbitrate" and that "the judiciary rather than an arbitrator decides whether a contract came into being").

### B.    Policy In Favor Of Arbitration
####        Does Not Apply In This Case

As a general policy matter, federal courts favor arbitration. *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1159 (7th Cir. 2016) ("The [Federal Arbitration Act] contains a general policy favoring arbitration and a liberal federal policy favoring arbitration agreements.") (internal quotation omitted). But that general preference yields to explicit contrary contractual language. As we explained in *Andermann v. Sprint Spectrum L.P.*, the "federal policy favoring arbitration" was originally formulated to simply "make clear, as had seemed necessary because of judges' historical hostility to arbitration, that arbitration was no longer to be disfavored." 785 F.3d 1157, 1159 (7th Cir. 2015). For unambiguous contracts, however, the agreement, as reflected by the document's explicit terms, controls. *Id.* (holding that a court must respect the parties' "dispute-resolution preferences as embodied in an arbitration clause"); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010) (reiterating that "it is the court's duty to interpret the [parties'] agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter [such that] the presumption of arbitrability [applies] only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand") (internal quotation omitted).

### C.    The Lexington Agreement Incorporates
####        The JLA Set Forth In The Fund Policy

The district court held that the Lexington Policy incorporates the Fund Policy's JLA. The court grounded its reasoning in Endorsement A to the Lexington Policy, which provides

that: "Policy follows form and is excess over the [Fund Policy] and endorsements." App'x 5 at 32.

Following form "is an insurance industry term of art that is typically understood by insurance professionals to suggest that an excess or umbrella policy incorporates the terms of another underlying policy." *Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 829 (Wis. 2012) (citation omitted). As such, absent explicit limitations to the contrary, a follow form provision incorporates the terms, definitions, exclusions, and conditions of the underlying policy "to ensure that the same terms of coverage are maintained between primary and excess levels of insurance." *Id.*

Here, the district court determined that: (1) the Lexington Policy, pursuant to its Endorsement A, followed the form of the Fund Policy; (2) no other provisions of the Lexington Policy removed the Fund Policy's JLA from the scope of the Lexington Policy's follow form provision; and therefore, (3) the Lexington Policy incorporated the Fund Policy's JLA. The Fund concedes this argument on appeal, and with good reason. We affirm the district court's finding that the Lexington Policy incorporates the Fund Policy's JLA.

### D. The JLA Does Not Compel Lexington's Participation In The Arbitration

We now turn to whether the Fund Policy's JLA entitles Lexington to insert itself in the arbitration between Cincinnati and the Fund. In this case, the *only* potential basis for such an imposition is the Fund Policy's JLA, as incorporated into the Lexington Policy. As always, we begin with the operative text. *See State ex rel. Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (Wis. 1990) (reiterating that the "cornerstone of contract

construction is to ascertain the true intentions of the parties as expressed by the contractual language").

### E.     The JLA Provisions Are Clear

The Fund Policy's JLA, incorporated into the Lexington Policy by virtue of the latter's follow form provision, states as follows:

> In the event of damage to or destruction of property, at a location designated in this policy and also designated in a Boiler and Machinery Insurance Policy(ies) and there is a disagreement between the insurers with respect to:
>
> (1) Whether such damage or destruction was caused by a peril insured against by this policy or by a peril insured against by such Boiler and Machinery Insurance Policy(ies) or
>
> (2) The extent of participation of this policy and of such Boiler and Machinery Insurance Policy(ies) in a loss of which is insured against, partially or wholly, by any or all of said policies.
>
> This company shall, upon written request of the insured, pay to the insured one-half of the amount of the loss which is in disagreement, but in no event more than this company would have paid if there had been Boiler and Machinery Insurance Policy(ies) in effect, subject to the following conditions:
>
> (1) The amount of loss which is in disagreement, after making provisions for any undisputed claims payable under the said policies and after

the amount of the loss is agreed upon by the insured and the insurers, is limited to the minimum amount remaining payable under either the Boiler and Machinery or Fire Policy(ies);

(2) The Boiler and Machinery insurer(s) shall simultaneously pay to the insured one-half of said amount which is in disagreement;

(3) *The payments by the insurers hereunder and acceptance of the same by the insured signify the agreement of the insurers to submit to and proceed with arbitration within 90 days of such payments*; the arbitrators shall be three in number, one shall be appointed by the Boiler and Machinery insurer, one shall be appointed by the Fund, and the third appointed by consent of the other two. The decision by the arbitrators shall be binding on the insurers and that judgment upon such award may be entered in any court of competent jurisdiction;

(4) The insured agrees to cooperate in connection with such arbitration but not to intervene therein;

(5) The provisions of this endorsement shall not apply unless such other policy(ies) issued by the Boiler and Machinery insurance company(ies) is similarly endorsed; and

(6) Acceptance by the insured of some payment pursuant to the provisions of this endorsement, including an arbitration award, shall not oper-

> ate to alter, waive, surrender or in any way af-
> fect the rights of the insured against any of the
> insurers.

App'x 4 at 24 (emphasis added).

The JLA is not ambiguous. *See Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 594 n.8 (Wis. 2013) ("Ambiguity is found where a contract is fairly susceptible of more than one construction, not necessarily where different constructions are argued.") (internal quotation omitted). Wisconsin contract law provides that "terms incorporated by reference within the contract (but which the contract does not go on to define) do not create an ambiguity." *Matthews v. Wisconsin Energy Corp.*, 534 F.3d 547, 554 (7th Cir. 2008) (citation omitted). So long as "the extrinsic terms are clearly identifiable, the parties agree to abide by those terms just as they agree to the other terms in the contract." *Id.* (citation omitted); *see also Barrons v. J. H. Findorff & Sons, Inc.*, 278 N.W.2d 827, 831 (Wis. 1979) (terms of a preceding contract "incorporated by reference in the [operative] contract" govern). This principle of interpretation is particularly forceful when, as here, the provision at issue is incorporated wholesale by virtue of a follow form provision. *See Wadzinski*, 818 N.W.2d at 829 (following form "is typically understood by insurance professionals to suggest that an excess or umbrella policy *incorporates the terms* of another") (emphasis added); *see also Tufail*, 833 N.W.2d at 592 ("Contract language is construed according to its plain or ordinary meaning, consistent with what a reasonable person would understand the words to mean under the circumstances. For a business contract, that is the manner that it would be understood by persons in the business to which the contract relates.") (internal quotations omitted).

In sum, the terms of the Fund Policy JLA mean the same thing whether they are read within the Fund Policy or incorporated into the Lexington Policy. Thus, "insured," as originally used in the Fund Policy JLA (and as incorporated in the Lexington Policy) means the County. This is hardly revelatory—unambiguous language remains unambiguous when it is incorporated into another contract. Our task now is to apply this same unambiguous language "according to its literal terms and consistent with what a reasonable person would understand the words to mean under the circumstances." *Fabco Equip., Inc. v. Kreilkamp Trucking, Inc.*, 841 N.W.2d 542, 546 (Wis. Ct. App. 2013) (internal quotation omitted).

### F. The JLA Does Not Constitute An Agreement To Arbitrate With Lexington

The Fund Policy JLA, by its "literal terms," is not an agreement to arbitrate at all. Instead, the Fund Policy JLA merely codifies a procedure whereby the parties *can potentially* agree to arbitrate. App'x 4 at 24 ("The *payments* by the insurers … *and acceptance* of the same by the insured *signify the agreement* of the insurers to submit to and proceed with arbitration within 90 days of such payments.") (emphasis added). That procedure, as spelled out above, requires a demand by the insured; a dispute between the insurers about liability; payment by each insurer of half the disputed amount; and acceptance of payment by the insured. Only by completing each of these enumerated steps can the parties form an agreement to arbitrate under the Fund Policy JLA. None of these steps occurred with respect to Lexington.

To be clear, the Fund Policy JLA's payment-and-acceptance process is not merely a procedural mechanism at-

tendant to an already-enforceable arbitration agreement. Instead, this procedure is the means by which the parties form an agreement to arbitrate. The stark contrast provided by Cincinnati and the Fund underscores this critical difference. Both the Fund and Cincinnati disputed the demands made by the County. Both the Fund and Cincinnati paid the County one-half of the disputed amount in response to the County's invocation of its rights under the two JLAs. By the JLAs' literal terms, the Fund and Cincinnati were only obligated to arbitrate their dispute upon the County's acceptance of those same payments. In other words, the "literal terms" of the Fund Policy JLA provide the method by which the parties can "signify" their agreement to arbitrate.

Based upon the undisputed record here, Lexington simply did not employ the signifying procedure to trigger an agreement to arbitrate. Lexington never received a request for payment from the County, and Lexington never made a payment to the County.[1] Moreover, neither Cincinnati nor the Fund nor the County communicated any of the enumerated signals to Lexington. Consequently, the parties did not agree to arbitrate a dispute with Lexington under the Fund Policy JLA.

### G.   This Court's Reading Remains Consistent With *Madison Teachers*

Lexington argues that, under Wisconsin law, "the failure to satisfy one condition in an agreement to proceed to arbitration" may not "thwart the intent of an arbitration provision,

---

[1] Lexington did pay $5 million to the Fund. Under the Fund Policy JLA, however, the County (not the Fund) is the "insured." Moreover, Lexington does not argue that this transfer had anything to do with the Fund Policy JLA's payment-and-acceptance process.

which is to resolve a dispute with an arbitrator rather than in a courthouse." Appellant Br. at 36 (citing *Madison Teachers, Inc. v. Wisconsin Educ. Ass'n Council*, 703 N.W.2d 711 (Wis. Ct. App. 2005)). This principle is true (so far as it goes), but not controlling here.

In *Madison Teachers*, the parties' arbitration agreement specifically named an individual to serve as arbitrator; however, the named individual was not available at the time of the parties' dispute. *Madison Teachers, Inc.*, 703 N.W.2d at 717. The trial court held that the parties were no longer bound to arbitrate in the absence of the named arbitrator. *Id.* at 713. The Wisconsin Court of Appeals reversed on the grounds that the named arbitrator's absence was not "more important than the arbitration process itself." *Id.* at 717. Indeed, the court took pains to note that the use of the named arbitrator in that case was *not* a "condition precedent … central to" the parties' arbitration agreement. *Id.* at 715–16.

*Madison Teachers* is clearly not this case. *Madison Teachers* involved an express agreement to arbitrate. The Fund Policy JLA does not contain an express agreement to arbitrate, but merely provides a means by which the parties may express an agreement to arbitrate, and no party ever agreed to arbitrate any dispute with Lexington. Nor did Lexington engage in the Fund Policy JLA's payment-and-acceptance process.

### H.    This Court's Reading Gives Full Force And Effect To The Provisions Of The JLA

Lexington also argues that if we do not interpret the Fund Policy JLA to compel its participation in the arbitration between the Fund and Cincinnati, we render the Fund Policy

JLA a nullity in contravention of established principles of contractual interpretation. Appellant Br. at 22. Not so. The plain text of the Fund Policy JLA provides a means by which the "insured" and the "insurers" can "signify" their agreement to arbitrate. The JLA, both as it is originally found in the Fund Policy and as incorporated into the Lexington Policy, retains this meaning today. It is merely dormant here because, as a factual matter, no party availed itself of this procedure vis-à-vis Lexington.

### I.      Lexington's Status As A Reinsurer Or Excess Insurer Remains Irrelevant

The parties have spent considerable time on appeal debating a question left unanswered by the district court, namely, whether Lexington is an "excess insurer" or a "reinsurer." We agree with the district court that there is no need to answer this particular question.

The only possible ground for granting Lexington the relief it seeks is the JLA, as incorporated into the Lexington Policy from the Fund Policy. The JLA, in turn, is an unambiguous contractual provision, which we interpret according to its literal terms. The parties' dueling characterizations of the nature of the Lexington Policy are simply not implicated by that process.

### III.   Conclusion

The Fund Policy JLA provides a procedure whereby the parties could "signify" an agreement to arbitrate. No such signals were exchanged between Lexington and any party here and, as a result, no agreement to arbitrate exists between Lex-

ington and the other insurers. Absent such an agreement, Lexington is not entitled to insert itself into the arbitration between the Fund and Cincinnati.

For these reasons, the judgment of the district court is AFFIRMED.